# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

SONIA LITTLE,  
individually, and on behalf of others  
similarly situated, et al.,

   Plaintiffs,

v.

GROOME TRANSPORTATION  
OF GEORGIA, INC.,

   Defendant.

CIVIL ACTION NO.  
1:07-CV-0455-JOF

## **OPINION AND ORDER**

This matter is before the court on Plaintiff's motion to certify class [38]; Plaintiff's motion for leave to file excess pages on reply [47]; Plaintiff's motion to amend complaint [49]; Plaintiff's notice of objection to affidavit of Laura McConnell [50]; Plaintiff's motion to compel [54]; Plaintiff's motion to compel [55]; Defendant's motion for summary judgment [69]; and Plaintiff's motion to strike declarations of Christopher Groome and Lee Snow [81].

**I.     Background**

    **A.     Procedural History**

Plaintiff, Mathis Moore, Jr., filed suit individually and on behalf of others similarly situated, against Defendant, Groome Transportation of Georgia, Inc., on February 23, 2007, alleging violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.*, asserting that he was not properly paid for hours worked in excess of 40 hours per weekly pay period and was not properly paid for hours worked due to deductions for meal times. The court granted Plaintiff's motion to substitute Sonia Little as named Plaintiff. Since that time, eleven additional plaintiffs have signed opt-in notices. Plaintiff defines the class period from February 15, 2005 to the present.

    **B.     Facts**

Groome operates a twenty-four-hour-a-day business transporting people, baggage, and freight between Hartsfield-Jackson Atlanta International Airport, the Macon, Georgia area, the Columbus, Georgia area, and Phenix City, Alabama. Groome has facilities in Macon and Columbus. Each location is staffed by a manager, clerical assistant, dispatchers, an auto mechanic, and vehicle drivers. In each location, Groome has approximately twenty vans and employs between sixty-five and seventy drivers. In the past three years, Groome has employed approximately 500 drivers at both locations. Commercial driver's licenses are required to operate the company's motor coach buses but not the company vans. Each

2

location has eighteen to twenty-two passenger vans and two motor coaches with one to three minibuses split between the locations. "Each driver is told upon employment that his/her shift/route may change, and that he/she may be called to cover another shift for any number of reasons." *See* Groome Decl., ¶ 16.

Groome provides twenty-six daily round trips between Macon, Warner Robins, Robins Air Force Base, and Hartsfield-Jackson. Most of Groome's passengers fly into or out of Hartsfield-Jackson. Groome delivers interstate baggage for airlines. Groome is contracted by airlines to deliver baggage when it arrives at Hartsfield-Jackson within the company's zone of operations or to ship the baggage outside the zone of operations via bus line. AirTran Airlines, Inc., has an open account with Groome for transport and delivery of passengers' baggage that is lost or delayed. Groome's drivers transport lost baggage for AirTran and give receipts for the delivery of that baggage to Groome dispatchers. During the selected time periods (as discussed below), Groome invoiced AirTran on an open account for 738 pieces of delayed or found baggage. Each of these pieces of luggage was involved in an interstate trip.

Under Delta's "contract for carriage" with its passengers, Delta is obligated to transport a passenger if he misses his flight due to flight delay, flight cancellation, or substitution of equipment. Delta transports the passenger on the next available flight or for travel "via ground transportation." Delta has an open account with Groome for ground

3

transportation in these situations. Groome has transported Delta passengers via Groome's vans to Macon. During the selected time periods, Groome transported 1,793 Delta passengers on open account, and each of these passengers was involved in an interstate itinerary. ASA has an open account with Groome for the transportation of its crew members. During the selected time period, Groome invoiced ASA for the transportation of 417 crew members, each of whom was involved in an interstate trip.

Groome also picks up and delivers interstate air freight. Groome has an open account with Stover Medical under which Groome transports local packages for final delivery and transport from Atlanta, Georgia to East Hartford, Connecticut, by picking up urine specimens from Macon Occupational Medicine and transporting them to Delta Dash for shipping to Connecticut.[1] Groome has an open account with Eagle Global Logistics, LP for transport of local packages for final delivery and transport from Atlanta, Georgia, to Kansas City, Missouri.

Finally, on a "limited basis," local travel agencies such as Sunspree Vacation and A&D Travel purchase blocks of round trip Groome vouchers for transportation to and from

---

[1] Plaintiff is correct to note that one citation given for this statement of fact is a deposition expert from Mathis Moore, a Groome driver, who states that he has never heard of Stover. Mr. Moore, however, did testify that he picked up urine samples from Macon Occupational Medicine and transported them to Delta Dash. It is hardly surprising that Mr. Moore was not aware the actual customer was Stover Medical. Timothy Glynn, the Chief Financial Officer of Groome, testified as to the open account arrangement with Stover Medical.

AO 72A
(Rev.8/82)

Hartsfield-Jackson as part of an interstate travel arrangement. Groome's drivers also drove chartered van trips for military personnel transporting them to Hartsfield-Jackson and for other purposes.

Groome drivers comply with the Department of Motor Vehicle requirements that drivers work no more than sixty hours in any given seven-day period, and if a driver works for more than one employer, he must turn in the log of all of his driving time. Groome drivers perform a safety-sensitive function. All drivers perform a safety check (including tires, horn, lights, windshield wipers, safety breaks, oil, and antifreeze) on their vans daily at the beginning and conclusion of their shift. A safety report is maintained as required by the Department of Transportation.

As documented on a Compliance Action Report, in 2001, the Department of Labor conducted a "full investigation" of Groome's operations in Columbus, Georgia, and concluded that no overtime violations had occurred because the motor carrier exemption to the FLSA covered Groome's operations. The report noted that "13(b)(1) found applicable to drivers and dispatchers returning lost luggage from Atlanta airport to customers." *See* WISHARD Report, Def.'s Mot. for S.J., Exh. 13, at 2. The report further elaborates:

> All of the drivers regularly pick up baggage from the Atlanta Airport that has been lost or separated from its owners for shipment to the Columbus office of Groome Transportation. The dispatchers then contact the owner and either has them come to the office and gives the baggage to them or has the drivers take the baggage to the address for an additional charge to the owner. The firm has

5

an agreement with the airlines at Atlanta Airport to ferry the lost baggage back to Columbus. The airlines are then charged $26.00 per bag.

*Id.* at 3.

### C. Contentions

Plaintiff contends that Defendant violated the Fair Labor Standards Act because she and others similarly situated to her were not paid time-and-a-half for hours worked in excess of forty hours per week; and had improper deductions taken from her pay check for meal times, uniforms, identification badges, and insurance deductible coverage.

Defendant responds that its drivers are exempt from coverage under the FLSA through the motor carrier exemption. Even if its drivers were not exempt, Defendant argues that Plaintiff's pay was not improperly docked when she took meals, and her pay did not fall below the minimum wage when deductions were made for uniforms, identification badges, and insurance coverage deductibles because of a permissible "tip credit" under the FLSA.

## II. Discussion

### A. Preliminary Matters

#### 1. Motion to Amend Complaint

On February 19, 2008, Plaintiff filed a motion to amend her complaint. In her first amended complaint, Plaintiff alleged that "drivers were denied compensation for on-call time, compensation for all hours worked over forty (40) hours per week at the rate of one and one-half (1 ½) times the regular rate of pay, compensation for lunch breaks while

6

working or on-call, and possible other violations." *See* First Amended Complaint, ¶ 15. In her proposed amended complaint, Plaintiff seeks to add claims that she was not paid minimum wage because of deductions for uniforms, badges, and damage caused to vehicles.

Plaintiff's motion is outside the deadline set forth in the parties' Joint Preliminary Report and Discovery Schedule. As such, Plaintiff must show both good cause under Federal Rule of Civil Procedure 16(b), as well as satisfy the requirements of Federal Rule of Civil Procedure 15 in order to be permitted to amend her complaint. *See Sosa v. Airprint Systems*, Inc., 133 F.3d 1417, 1418-19 (11th Cir. 1998) (per curiam). Under Rule 16(b), the Scheduling Order may be modified only "upon a showing of good cause." *Id.*; *see also Brewer-Giorgio v. Producers Video, Inc.*, 216 F.3d 1281, 1284 (11th Cir. 2000) (finding no abuse of discretion in district court's denial of motion to amend complaint filed eight months after deadline established in scheduling order because plaintiff had not shown good cause). "This good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'" *Sosa*, 133 F.3d at 1418.

Plaintiff contends that it was not until counsel interviewed opt-in plaintiff Bobby Taylor that the additional basis for the claims was understood. Plaintiff further avers that Defendant had the opportunity to question various plaintiffs on the matters of deductions during depositions that occurred on December 21, 2007. Discovery in the case did not close until April 21, 2008. The law generally favors the consideration of all potential claims

under one complaint. The parties had not filed motions for summary judgment at the time the motion to amend was filed. Defendant fully addressed the allegations of improper deductions in its motion for summary judgment based on information in part gleaned from Plaintiff and opt-in plaintiffs in their depositions. Thus, the court finds that Defendant would not be prejudiced by the addition of the specific deduction claims. For the foregoing reasons, the court GRANTS Plaintiff's motion to amend complaint [49].

### 2. Declaration of Lee Snow and Christopher Groome

During the course of discovery, Groome served a subpoena upon Delta, AirTran, and ASA, seeking records of passenger ground transportation vouchers and passenger itineraries. The request originally made by Groome was quite voluminous, and through agreement with the three airlines, Groome pared down the request to a "random" sampling of various points in time during the past three years. Lee Snow, an employee of Holland & Knight, Defendant's law firm, then went through the documents produced by the three airlines and created a "summary chart" of the information contained in those documents. The charts created by Mr. Snow show the date of the voucher, the passenger's name, flight number, and the passenger's complete itinerary.

Plaintiff objects to Mr. Snow's compilations stating that he has no personal knowledge of the billing arrangements between Groome and the airlines, how Groome billed the airlines, and cannot authenticate any business records. However, Christopher Groome,

8

AO 72A
(Rev.8/82)

Vice President of Safety Services for Groome, testified that the vouchers given by the various airlines to passengers were then passed on to Groome. *See* C. Groome Decl., ¶¶ 6, 10, 13. Groome kept copies of those vouchers in the regular course of its business and copies were forwarded to Holland & Knight to be used by Mr. Snow in his summary. *Id.* On a motion for summary judgment, the court may consider evidence that could be reduced to admissible evidence at trial. *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (reaffirming "general rule [] that inadmissible hearsay cannot be considered on a motion for summary judgment") (quotation and citation omitted). However, a district court may "consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Id.* at 1323 (quotations and citations omitted). It would be possible for either Mr. Groome or a representative of the airlines to testify as to the nature of these records as business records, and Mr. Snow's chart could be admitted as a summary compilation under Federal Rule of Evidence 1006. As such, the court will consider the facts as described in Mr. Snow's chart.

Plaintiff also objects to Defendant's characterization of Mr. Snow's chart as "random sampling" of the airlines' records. The court finds this objection more persuasive. Mr. Groome testified that the amount of vouchers was voluminous and thus he "created a statistically random sample period for the production of voucher documentation for each of

9

the three [airlines], and oversaw the compilation of the same. The sample period was defined as follows: 1) the third week of November 2005; and 2) every other month from February 2006 to February 2007 for either the second or third week of said months." *See* Groome Decl., ¶ 14. No further explanation was given for how these "statistically random" time periods were chosen.

The court recognizes that Defendant agreed in the interests of cooperation and efficiency of discovery that the subpoenaed airlines would only have to turn over records for certain time period during the past three years. The court, however, cannot infer that these chosen time periods are "random" in any statistical sense. Nor can the court extrapolate that the other time periods would contain similar types of passenger trips. What the court can take from Mr. Snow's chart is that on these particular dates, certain passengers using Groome transportation to get to various Georgia airports flew on certain interstate routes or certain lost/delayed baggage was taken by Groome transportation to owners. The court can then consider these straightforward facts to determine whether they are sufficient for the court to find that Defendant is entitled to the relevant FLSA exemption. For the foregoing reasons, the court denies Plaintiff's motion to strike the testimony of Christopher Groome and Lee Snow [81].

10

### 3. Declaration of Laura McConnell

Ms. McConnell testified that she has been employed by Groome since April 2007 as Operations Manager. Her responsibilities include "staffing and training of drivers, dispatcher, preparation of all Groome records, reports and transactions, (including personnel records payroll, vehicle maintenance and safety) route scheduling, and review of drivers' timesheets/Manifests." *See* McConnell Decl., ¶ 3.

Plaintiff objects to the declaration of Laura McConnell arguing that she is a "surprise" witness who was not listed on any disclosures. Defendant responds that Groome's Chairman testified in his Rule 30(b)(6) deposition that the company employed an operations manager in Macon. Documents produced in discovery also contained the name "Laura" or "Laura McConnell," and at least one opt-in plaintiff worked directly with Ms. McConnell. Thus, there could be no unfair surprise in the production of her declaration.

Plaintiff cites to *Quitto v. Bay Colony Golf Club, Inc.*, 2007 WL 2002537 (M.D. Fla. July 5, 2007), for the proposition that affidavits do not provide an opposing party an opportunity to question their content and may constitute unfair surprise. *Quitto*, however, does not discuss that proposition and distinguishes that situation from the one faced by the court there. *Id.* at *14. In *Corwin v. Walt Disney Co.*, 475 F.3d 1239 (11th Cir. 2007), cited by the *Quitto* court, the Eleventh Circuit discussed only the timeliness of disclosures of

11

expert reports. *Id.* at 1252. Neither of these cases is applicable to Ms. McConnell's declaration, and the court will not strike Ms. McConnell's declaration.

## B. FLSA Motor Carrier Exemption

Numerous district courts in the Eleventh Circuit have considered the application of the motor carrier exemption to transportation companies who employ limousine drivers. *See generally Walters v. American Coach Lines of Miami, Inc.*, ___ F. Supp. 2d ___, 2008 WL 2967170 (S.D. Fla. 2008); *Garcia v. Fleetwood Limousine*, 511 F. Supp. 2d 1233 (M.D. Fla. 2007); *Powell v. Carey International, Inc.*, 490 F. Supp. 2d 1202 (S.D. Fla. 2006); *Powell v. Carey International, Inc.*, 483 F. Supp. 2d 1168 (S.D. Fla. 2007); *Morrison v. Quality Transports Services, Inc.*, 474 F. Supp. 2d 1303 (S.D. Fla. 2007); *Rossi v. Associated Limousine Services, Inc.*, 438 F. Supp. 2d 1354, 1361 (S.D. Fla. 2006).

The Fair Labor Standards Act requires that employees who work in excess of forty hours per week be compensated "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The FLSA, however, directs that overtime pay is not required for any employee with respect to whom the Secretary of Transportation has power to establish "qualifications and maximum hours of service pursuant to section 21502" of the Motor Carrier Act. *See* 29 U.S.C. § 213(b)(1). This section of the FLSA is known as the motor carrier exemption. What activities a plaintiff does during the work day is a question of fact, while whether these activities exclude him

12

from the overtime benefits of the FLSA is a question of law. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986). Employers relying on an exemption to avoid the minimum wage and overtime requirements of the FLSA bear the burden of proving the applicability of that exemption. *Klinedinst v. Swift Inv., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001). Exemptions are narrowly construed against the employer. *Id.*

Under the Motor Carrier Act, 49 U.S.C. § 31,502, the Secretary of Transportation has the exclusive authority to regulate the maximum hours or service for employees who are (1) employed by a carrier whose transportation of property or passengers is subject to the Secretary's jurisdiction under the Motor Carrier Act; and (2) engaged in activities that directly affect the safety of operation of motor vehicles in interstate or foreign commerce. 29 C.F.R. § 682.2(a). The court notes that the Secretary of Transportation need not actually exercise his power to regulate under the Motor Carrier Act, and that the FLSA's motor carrier exemption applies so long as the Secretary would have the authority to regulate the employee. *Spires v. Ben Hill County*, 980 F.2d 683, 686 (11th Cir. 1993).

### 1. Carrier Subject to Jurisdiction of Secretary of Transportation

Under the Motor Carrier Act,

> Neither the Secretary [of Transportation] nor the [Surface Transportation] Board has jurisdiction under this part over–
> (A) transportation of passengers by motor vehicle incidental to transportation by aircraft;
> (B) transportation of property (including baggage) by motor vehicle as part of a continuous movement which, prior or subsequent to such part

13

> of the continuous movement, has been or will be transported by an air carrier or (to the extent so agreed by the United States and approved by the Secretary) by a foreign air carrier; or
> (C) transportation of property by motor vehicle in lieu of transportation by aircraft because of adverse weather conditions or mechanical failure of the aircraft or other causes due to circumstances beyond the control of the carrier or shipper;

49 U.S.C. § 13506(a)(8). Further, Section 24c04 of the Field Operations Manual of the Wage and Hour Division provides:

> Drivers of buses/shuttle services/limousines carrying interstate passengers and their baggage to and from transportation terminals within a single state are not engaged in interstate transportation of passengers and property within the meaning of the Motor Carrier Act, ***unless the transportation is part of a through-ticketing or other common arrangement between the motor carrier and the air carrier***. Therefore, Sec 13(b)(1) will not apply except in the case of a through-ticketing or other common arrangement for continuous passage or interchange between the motor carrier and the air carrier.
> An example would be where there is a through-ticketing arrangement under which passengers purchase a single ticket which is good for both the local bus ride and the prior or subsequent interstate journey by air, rail, or bus.

*Id.* (emphasis added).

The court in *Morrison* described the analysis as follows:

> An employer may meet the requirement that its employees were engaged in activities that directly affect interstate commerce by showing that there was "practical continuity of movement across state lines from the point of origin to the point of destination" even if the route is wholly intrastate. . . . However, where a carrier transports passengers between an airport and another point in the state, "operating wholly within a State, selling no through tickets, and having no common arrangements with connecting out-of-State carriers," such transport represents intrastate commerce regardless of the passengers' ultimate destination or intent to complete an interstate journey.

14

*Id.* at 1310.

The *Morrison* court found there was a question of fact as to whether the transportation company was engaged in interstate commerce because the company relied to a great extent on arrangements with travel agencies, a relationship that is insufficient to establish practical continuity of movement. *Id.* (citing *Rossi v. Associated Limousine Services, Inc.*, 438 F. Supp. 2d 1354, 1361 (S.D. Fla. 2006) (a "through-ticketing arrangement must be between the motor carrier and air carrier for continuous passage in order to render the motor carrier's operation interstate transportation"). The court also found troubling that although the transportation company had submitted invoices for trips paid by various airlines and rail lines, there was no evidence of the actual agreements themselves for the provision of regular transportation services, nor did the company "demonstrate[] that passengers purchased a single ticket for both inter- and intrastate travel." *Id.* The court continued:

> Although [defendant] has provided support for its assertion that it had provided some transfer services to air carriers and cruise companies, the Court cannot conclude based on these invoices alone, without a copy of [defendant's] agreements with these carriers or evidence of their terms, whether or not the arrangements between [defendant] and other carriers constituted a through-ticketing or other common arrangement that would bring it within the definition of "practical continuity of movement" in interstate commerce.

*Id.* at 1311.

AO 72A
(Rev.8/82)

However, in *Walters*, even without evidence of written agreements, the court accepted testimony from the transportation company's vice president and general manager that drivers regularly transported passengers between South Florida airports and seaports under various oral "contracts or other arrangements" that involved the purchase of a prearranged single ticket that included airfare, ground transportation, hotel, and cruise. *Id.* at *15. With other cruise lines, the transportation company had no specific evidence regarding the terms of its arrangements, but it did produce evidence of cash receipts and revenues derived from transportation of cruise line passengers. *Id.* Thus, the court concluded

> although Defendant's drivers do not cross the State line while driving the airport-to-seaport and seaport-to-airport routes, a substantial, regular and recurring part of their work in driving such routes consists of transporting persons that are making interstate and international trips. Likewise, as in *Marshall*,[2] because their work is entwined with a continuous stream of interstate and international travel, the Court finds that Defendant's drivers transporting passengers on the airport-to-seaport and seaport-to-airport routes are engaged in commerce within the meaning of the FLSA.

*Id.*

In *Garcia v. Fleetwood Limousine*, 511 F. Supp. 2d 1233 (M.D. Fla. 2007), the court considered "employer's overall business, including that number of interstate trips made and the percentage of revenue from interstate trips," and "whether the carrier holds itself out to the public as providing interstate transportation through advertising, marketing, or

---

[2]*Marshall v. Victoria Transp. Co.*, 603 F.2d 1122, 1123 (5th Cir. 1979).

otherwise" as "relevant factors" in determination of whether defendant is carrier whose transportation of passengers is subject to Secretary's jurisdiction under Motor Carrier Act. *Id.* at 1238-39 (citing *Morris v. McComb*, 332 U.S. 422 (1947)). In *Morris*, the Supreme Court found that the predecessor to the Secretary of Transportation had jurisdiction over a motor carrier whose trips in interstate commerce represented only three to four percent of the carrier's overall business. *Id.*

Here, Groome's officers testified that the company has "open accounts" with Delta and AirTran such that Groome will transport lost or delayed baggage to passengers at no cost to the passengers so that the airlines may fulfill their contractual obligations to the passengers. Further, if there is a delay or equipment problem, Groome will provide ground transportation at no cost to the passenger. While it is true these are not "through-ticketing" arrangements prepurchased by the customer for ground transportation to the airport and interstate travel, they are common arrangements between Groome and the airlines. Mr. Snow's summary compilation shows a large number of actual transportation of individuals and baggage that involved an interstate itinerary. Groome's contractual work with Stover Medical and Eagle Global Logistics, LLP, for shipment of packages to Connecticut and Missouri, respectively, clearly constitutes interstate travel. Finally, the court notes that although not dispositive, the fact that the Department of Labor concluded in 2001 that the motor carrier exemption applies to Groome based on Groome's agreement with air carriers

17

to transport lost luggage does impact the court's analysis. For the foregoing reasons, the court concludes that Groome is subject to the jurisdiction of the Department of Transportation.

### 2. Employees Engage in Activities that Directly Affect Interstate Commerce

Again, *Morrison* instructs:

> The Secretary of Transportation has the power to set maximum hours for drivers if the company engages in even a minor involvement with interstate commerce, which includes a company that holds itself out as an interstate company and solicits that business, even though its prospect of obtaining such business is poor and some of its drivers never drive in interstate commerce. . . . However, the Secretary does not have automatic jurisdiction over all drivers of an interstate carrier; jurisdiction extends "only to drivers who reasonably could be expected to make one of the carrier's interstate runs, and that means more than a remote possibility." . . . Moreover, for the reasonable expectation test to apply, "a carrier's involvement in interstate commerce must be established by some concrete evidence such as an actual trip in interstate commerce or proof that interstate business was solicited, . . . and the carrier must be shown to "have engaged in interstate commerce within a reasonable period of time prior to the time at which jurisdiction is questioned." . . .

*Id.* at 1310.

To determine whether drivers could reasonably be expected to drive passengers on interstate runs, courts have considered whether (1) the employer was engaged in interstate commerce, (2) upon hiring, the employer required the employee to sign a form acknowledging that he may be called upon to drive for company's interstate charter service, (3) employer required drivers to comply with federal regulations, (4) employer maintained

18

vehicles in accordance with ICC regulations, and (5) whether Federal Highway Administration regularly performed safety audits. *See Garcia v. Pace Suburban Bus Service*, 955 F. Supp. 75, 77-78 (N.D. Ill. 1996); *see also Chao v. First Class Coach*, 214 F. Supp. 2d 1263, 1275 (M.D. Fla. 2001). Here, Groome's drivers were subject to the Department of Transportation work hour limitations, as well as medical evaluations. The drivers also perform safety checks before getting into their vehicles. The Department of Transportation periodically conducts audits at Groome's facilities. *See* C. Groome Depo., at 11-12, 14, 18-19. Groome's drivers, who were advised that they could be called upon to do any company route, clearly took routes that involved practical continuous interstate travel. Based on the foregoing, the court concludes that all of Groome's drivers could reasonably have expected to drive on a run impacting interstate travel.

Because the court has concluded that Defendant satisfies the two prongs of the FLSA's motor carrier exemption, the court GRANTS Defendant's motion for summary judgment [69] and need not consider Plaintiff's claims concerning overtime and deduction issues.

## III. Conclusion

The court DENIES AS MOOT Plaintiff's motion to certify class [38]; GRANTS Plaintiff's motion for leave to file excess pages on reply [47]; GRANTS Plaintiff's motion to amend complaint [49]; DENIES AS MOOT Plaintiff's motion to compel [54]; DENIES

19

AS MOOT Plaintiff's motion to compel [55]; GRANTS Defendant's motion for summary judgment [69] and DENIES Plaintiff's motion to strike declarations of Christopher Groome and Lee Snow [81].

**IT IS SO ORDERED** this 15th day of September 2008.

s/ J. Owen Forrester
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)